# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALBANY MED HEALTH SYSTEM
43 New Scotland Avenue
Albany, NY 12208

ALBANY MEDICAL CENTER HOSPITAL
43 New Scotland Avenue
Albany, NY 12208

COLUMBIA MEMORIAL HOSPITAL
71 Prospect Avenue
Hudson, NY 12534

GLENS FALLS HOSPITAL
100 Park Street
Glens Falls, NY 12801

BRONSON HEALTH CARE GROUP, INC.
301 John Street
Kalamazoo, MI 49006

BRONSON LAKEVIEW HOSPITAL
408 Hazen Street
Paw Paw, MI 49079

BRONSON METHODIST HOSPITAL
601 John Street
Kalamazoo, MI 49007

BRONSON BATTLE CREEK HOSPITAL
300 North Avenue
Battle Creek, MI 49017

TRUSTEES OF THE UNIVERSITY OF
PENNSYLVANIA
3400 Spruce Street
Philadelphia, PA 19104

HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA
3400 Spruce Street
Philadelphia, PA 19104

No. 1:25-cv-3490

1

PENNSYLVANIA HOSPITAL OF THE
UNIVERSITY OF PENNSYLVANIA
HEALTH SYSTEM
800 Spruce Street
Philadelphia, PA 19107

PRESBYTERIAN MEDICAL CENTER OF
THE UNIVERSITY OF PENNSYLVANIA
HEALTH SYSTEM
d/b/a PENN PRESBYTERIAN MEDICAL
CENTER
51 N. 39th Street
Philadelphia, PA 19104

THE LANCASTER GENERAL HOSPITAL
555 North Duke Street
Lancaster, PA 17604

MOSAIC MEDICAL CENTER
MARYVILLE
2016 S Main Street
Maryville, MO 64468

HEARTLAND REGIONAL MEDICAL
CENTER
d/b/a MOSAIC LIFE CARE
5325 Faraon Street
St. Joseph, MO 64506

UMASS MEMORIAL HEALTH CARE,
INC.
One Biotech Park
365 Plantation Street
Worcester, MA 01605

UMASS MEMORIAL MEDICAL CENTER,
INC.
55 Lake Avenue North
Worcester, MA 01655

UMASS MEMORIAL
HEALTHALLIANCE-CLINTON
HOSPITAL, INC.
60 Hospital Road
Leominster, MA 01453

UMASS MEMORIAL HEALTH –
HARRINGTON
HOSPITAL, INC.
100 South Street
Southbridge, MA 01550

DUKE UNIVERSITY HEALTH SYSTEM,
INC.
310 Blackwell Street 4th Floor
Durham, NC 27701

DUKE UNIVERSITY HOSPITAL
2301 Erwin Road
Durham, NC 27710

DUKE REGIONAL HOSPITAL
3643 North Roxboro Street
Durham, NC 27708

YALE NEW HAVEN HEALTH
SERVICES CORPORATION
789 Howard Avenue
New Haven, CT 06519

BRIDGEPORT HOSPITAL
267 Grant Street
Bridgeport, CT 06610

YALE NEW HAVEN HOSPITAL, INC.
20 York Street
New Haven, CT 06510

LAWRENCE + MEMORIAL HOSPITAL
365 Montauk Avenue
New London, CT 06320

BAPTIST HEALTH SOUTH FLORIDA,
INC.
6855 Red Road, Suite 600
Coral Gables, FL 33143

BAPTIST HOSPITAL OF MIAMI
8900 North Kendall Drive
Miami, FL 33176

BETHESDA HOSPITAL
d/b/a BETHESDA HOSPITAL EAST
d/b/a BETHESDA HOSPITAL WEST
2815 South Seacrest Boulevard
Boynton Beach, FL 33435

DOCTORS HOSPITAL
5000 University Drive
Coral Gables, FL 33146

HOMESTEAD HOSPITAL
975 Baptist Way
Homestead, FL 33033

SOUTH MIAMI HOSPITAL
6200 SW 73rd Street
South Miami, FL 33143

WEST KENDALL BAPTIST HOSPITAL
9555 SW 162nd Avenue
Miami, FL 33196

FISHERMEN'S HOSPITAL
3301 Overseas Highway
Marathon, FL 33050

MARINERS HOSPITAL
91500 Overseas Highway
Tavernier, FL 33070

MERCY HEALTH
15740 S. Outer 40 Road
Chesterfield, MO 63017

MERCY HOSPITAL FORT SMITH
7301 Rogers Avenue
Fort Smith, AR 72903

MERCY HOSPITAL BERRYVILLE
214 Carter Street
Berryville, AR 72616

MERCY HOSPITAL BOONEVILLE
880 W Main
Booneville, AR 72927

MERCY HOSPITAL COLUMBUS
220 N Pennsylvania Avenue
Columbus, KS 66725

MERCY HOSPITAL JOPLIN
100 Mercy Way
Joplin, MO 64804

MERCY HOSPITAL LEBANON
100 Hospital Drive
Lebanon, MO 65536

MERCY HOSPITAL SPRINGFIELD
1235 E Cherokee Street
Springfield, MO 65804

MERCY HOSPITAL ST. LOUIS
615 S New Ballas Road
Saint Louis, MO 63141

MERCY HOSPITAL AURORA
500 Porter Avenue
Aurora, MO 65605

MERCY HOSPITAL CARTHAGE
3125 Dr Russel Smith Way
Carthage, MO 64836

MERCY HOSPITAL CASSVILLE
94 Main Street
Cassville, MO 65625

MERCY HOSPITAL LINCOLN
1000 E Cherry Street
Troy, MO 63379

MERCY ST. FRANCIS HOSPITAL
100 W Highway 60
Mountain View, MO 65548

MERCY HOSPITAL JEFFERSON
Highway 61 South
Crystal City, MO 63019

MERCY HOSPITAL PERRY
434 N. West Street
Perryville, MO 63775

MERCY HOSPITAL ADA INC.
340 N Monte Vista Street
Ada, OK 74820

MERCY HOSPITAL ADMORE INC
1011 14th Avenue NW
Ardmore, OK 73401

MERCY HEALTH LOVE COUNTY
300 Wanda Street
Marietta, OK 73448

MERCY HOSPITAL HEALDTON INC
3462 Hospital Road
Healdton, OK 73438

MERCY HOSPITAL LOGAN COUNTY
200 S Academy Road
Guthrie, OK 73044

MERCY HOSPITAL TISHOMINGO INC
1000 S Byrd Street
Tishomingo, OK 73460

MERCY HOSPITAL WATONGA INC
500 N Clarence Nash Boulevard
Watonga, OK 73772

MERCY HOSPITAL KINGFISHER
1000 Kingfisher Regional Hospital Drive
Kingfisher, OK 73750

MERCY HOSPITAL OKLAHOMA CITY
4300 West Memorial Road
Oklahoma City, OK 73120

                        Plaintiffs,

v.

HEALTH RESOURCES AND SERVICES
ADMINISTRATION
5600 Fishers Lane
Rockville, MD 20857

THOMAS J. ENGELS
in his official capacity as
ADMINISTRATOR, HEALTH
RESOURCES AND SERVICES
ADMINISTRATION
5600 Fishers Lane
Rockville, MD 20857

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue SW
Washington, DC 20201

and

ROBERT F. KENNEDY JR.,
in his official capacity as SECRETARY,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue SW
Washington, DC 20201

                         Defendants.

## COMPLAINT

Plaintiffs bring this complaint against the Health Resources and Services Administration (HRSA), the Department of Health and Human Services (HHS), Thomas J. Engels, and Robert F. Kennedy Jr., and allege as follows:

### INTRODUCTION

1.     Plaintiffs are 340B covered entities—public and not-for-profit safety-net hospitals—that provide billions of dollars of charitable, undercompensated, and uncompensated care to vulnerable patients throughout the United States. Plaintiffs are the petitioners in a dispute resolu-

tion proceeding against a drug manufacturer, filed in November 2023, that is pending before Defendant HRSA. To date, HRSA has taken no action on this petition—it has not even appointed an adjudicatory panel, which is the first step in the process under HRSA's rules. Plaintiffs, harmed by the extensive and ongoing delay, seek an order pursuant to 5 U.S.C. § 706 compelling HRSA to timely adjudicate their petition.

2.    Hospitals that provide significant amounts of uncompensated and undercompensated care play a critical role in America's healthcare safety net, ensuring that lifesaving care is available to all who need it, including the country's most vulnerable. Participation in this safety net comes at a steep financial cost, however. Providing billions of dollars of free or discounted care to Americans each year leads to "substantially lower operating margins" for safety-net hospitals as compared to hospitals with less vulnerable, better-insured patient populations. Allen Dobson et al., *The Role of 340B Hospitals in Serving Medicaid and Low-income Medicare Patients*, 340B Health at 12 (July 10, 2020), perma.cc/8VH3-UGM3. The federal government has acknowledged this challenge and developed programs to help safety-net hospitals further stretch their scarce resources.

3.    In 1991 and 1992, the nation's safety-net hospitals were seriously threatened after drug manufacturers substantially increased drug prices following the establishment of the Medicaid Prescription Drug Rebate Program in 1990. The Medicaid Drug Rebate Program requires drug manufacturers to provide state Medicaid programs with rebates for covered outpatient drugs; in the two years following its implementation, drug manufacturers dramatically raised drug prices to compensate for revenue lost to Medicaid drug rebates—approximately 23% in 1991, and then another 25% in 1992. David K. Baugh et al., *Medicaid Prescription Drug Spending in the 1990s: A Decade of Change*, 25 Health Care Fin. Rev. 5, 8 (2004) (citing data from the Centers for Medicare

and Medicaid Services), perma.cc/EV9P-NENA. Additionally, features of the Medicaid Drug Re-

bate Program effectively closed pathways that safety-net hospitals had previously used to obtain

favorable prices from drug manufacturers.

4.      In 1992, recognizing that rising drug prices would inhibit the ability of health sys-

tems to serve the nation's most vulnerable populations, Congress created the 340B Drug Pricing

Program in Section 340B of the Public Health Service Act. *See* 42 U.S.C. § 256b. Congress's

express goal was to prevent manufacturers' rising prescription drug prices from "reduc[ing] the

level of services and the number of individuals that these hospitals and clinics are able to provide

with the same level of resources." H.R. Rep. 102-384, pt. 2, at 11 (1992).

5.      Section 340B is a voluntary program for drug manufacturers. In exchange for the

lucrative opportunity to sell drugs to federal healthcare programs that cover more than 150 million

beneficiaries, manufacturers must agree to also sell discounted drugs to statutorily defined 340B

"covered entities"—principally healthcare providers working with underserved populations.

6.      Recently, several drug manufacturers have sought to redefine the language of Sec-

tion 340B without legal basis. They assert that manufacturers can circumvent the statutory require-

ment to offer drugs at a discounted price by imposing conditions on their offers that prevent

covered entities from purchasing 340B discounted drugs to dispense to their patients under certain

circumstances.

7.      As relevant here, Teva Pharmaceuticals USA has imposed limitations on covered

entities' ability to access drugs at 340B prices when those drugs are dispensed through contract

pharmacies. Such pharmacies contract with safety-net hospitals to dispense drugs to those provid-

ers' patients on behalf of the provider, as opposed to the covered entity operating its own in-house

pharmacy.

8.      Contract pharmacies serve essential roles in treating patients of covered entities. Patient adherence to prescribed medications is essential to prevent adverse outcomes, hospital re-admissions, and, in extreme instances, even death. But many safety-net hospitals serve patient populations that cannot conveniently return to the hospital's main campus to fill all of their pre-scriptions, whether due to geographic, financial, or social barriers. Additionally, some illnesses require treatment with specialty medications which need particular handling and instructions that may be challenging for hospitals to provide on site. 340B entities have partnered with pharmacies through contractual arrangements to solve these problems for their patients, providing patients with the full spectrum of drugs they need in convenient, accessible settings. Since the beginning of the 340B program, 340B hospitals have purchased the drugs dispensed to their patients by con-tract pharmacies at the discounted 340B prices—prices to which the hospitals are statutorily enti-tled. And since the beginning of the 340B program, Congress and HRSA have understood that contract pharmacies play a critical role in the purchase and dispensing of 340B drugs.

9.      In 2010, Congress revised the 340B program to include an administrative dispute resolution (ADR) process to resolve disputes between covered entities. Patient Protection and Af-fordable Care Act (ACA). Pub. L. No. 111-148, Title VII, subtitle B, 124 Stat. 119, 821 (2010). 42 U.S.C. § 256b(d)(3); *see also Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 116 (2011).

10.     Plaintiffs here filed an ADR petition under Section 256b(d)(3) and HRSA's imple-menting regulations on November 21, 2023. On December 20, 2023, HRSA informed Plaintiffs that it had completed an initial review of the submitted documents and determined that the petition was complete. It explained that a panel had not yet been assigned to adjudicate the petition, but that the parties would be notified when a panel was assigned.

11.     The parties have submitted several additional filings relating to the petition, including a motion to stay by Teva, a motion for summary judgment by Plaintiffs, and a corresponding response and reply. Each motion has been fully briefed.

12.     It has been more than 22 months since the ADR action was filed—nearly two years—but HRSA has taken no action toward resolving the petition. It has not even appointed an adjudicatory panel. This delay is exceptional given HRSA's recent statement of its expectation "that the 340B ADR Panel will make a decision on a claim within one year of receiving the claim for review." *340B Drug Pricing Program: Administrative Dispute Resolution Regulation*, 89 Fed. Reg. 28,643, 28,653 (Apr. 19, 2024).

13.     As Plaintiffs have explained in their submissions to HRSA, they are being continuously harmed by the application of Teva's policy, which Plaintiffs contend is unlawful. They sought relief in the only venue permitted by statute—before HRSA. Yet, more than one and a half years later, the agency has not even *begun* the process by which Plaintiffs might obtain relief. HRSA's failure to act on the petition constitutes an unreasonable delay or an unlawful withholding of agency action; the Court should "compel" the agency to promptly adjudicate the petition pursuant to 5 U.S.C. § 706(1) and issue a writ of mandamus to the same effect.

## PARTIES

14.     Plaintiff UMass Memorial Health Care, Inc. is the leading provider of quality healthcare in central Massachusetts. UMass is incorporated in Massachusetts and is headquartered in Massachusetts.

15.     Plaintiff UMass Memorial Medical Center, Inc. is a trusted academic medical center for patients and families in Worcester, Massachusetts. UMass Memorial Medical Center is a component of UMass Memorial Health.

16.     Plaintiff UMass Memorial HealthAlliance-Clinton Hospital, Inc. is a full-service, acute care hospital that serves communities in North Central Massachusetts and Southern New Hampshire. UMass Memorial HealthAlliance-Clinton Hospital is located in Massachusetts and is a component of UMass Memorial Health.

17.     Plaintiff UMass Memorial Health – Harrington Hospital, Inc. is a medical center providing comprehensive care to patients in more than 25 communities across south-central Massachusetts and northeastern Connecticut. UMass Memorial Health – Harrington Hospital is located in Massachusetts and is a component of UMass Memorial Health.

18.     Plaintiff Duke University Health System, Inc. (DUHS) is a comprehensive academic healthcare system that provides high quality, patient- and family-centered care to communities throughout North Carolina and the surrounding region. DUHS is incorporated in North Carolina and headquartered in North Carolina.

19.     Plaintiff Duke University Hospital (DUH) is a top-ranked, full-service tertiary and quaternary care hospital located in Durham, NC. Duke University Hospital is operated as a division of DUHS.

20.     Plaintiff Duke Regional Hospital (DRH) is a 388-bed hospital offering a comprehensive range of medical, surgical, and diagnostic services to patients in Durham, Orange, Granville, and Alamance counties in North Carolina. Duke Regional Hospital is operated as a division of DUHS.

21.     Plaintiff Mosaic Life Care is a physician-led healthcare system serving 35 counties in northwest Missouri, northeast Kansas, southeast Nebraska, and southwest Iowa. Mosaic is incorporated in Missouri and headquartered in Missouri. Mosaic Life Care includes the Heartland

Regional Medical Center (d/b/a Mosaic Life Care) located in St. Joseph, Missouri. Heartland Regional Medical Center is a 352-bed hospital with a Level II Trauma Center and a Level II Stroke Center.

22.     Plaintiff Northwest Medical Center Association (d.b.a. Mosaic Medical Center – Albany) is a 25-bed Critical Access Hospital located in Albany, Missouri. Mosaic Medical Center – Albany is headquartered and incorporated in Missouri. It is a component of the Mosaic Life Care health system.

23.     Plaintiff Mosaic Medical Center Maryville is an 81-bed hospital with a Level III Stroke Center located in Maryville, Missouri. Mosaic Medical Center Maryville is headquartered and incorporated in Missouri. It is a component of the Mosaic Life Care health system.

24.     Plaintiff Albany Med Health System is the largest and only regionally governed not-for-profit health system in northeastern New York and western New England. Albany Med is incorporated in New York and headquartered in New York.

25.     Plaintiff Albany Medical Center Hospital is a 766-bed academic medical center and children's hospital offering the widest range of medical and surgical services in the Albany, New York region. It includes the area's only Regional Perinatal Center, Level I Trauma Center and Level I Pediatric Trauma Center. Albany Medical Center Hospital is a component of Albany Med Health System.

26.     Plaintiff Columbia Memorial Hospital is a hospital and regional health system providing comprehensive primary and specialty care to patients in Columbia and Greene counties in New York. Columbia Memorial Hospital is a component of Albany Med Health System.

27.     Plaintiff Glens Falls Hospital is a hospital with a 6,000 square mile service area spanning five diverse counties in New York's Adirondack region. Glens Falls Hospital is a component of Albany Med Health System.

28.     Plaintiff Bronson Healthcare Group, Inc. is a healthcare system serving patients and families throughout southwest Michigan and northern Indiana. Bronson is incorporated in Michigan and headquartered in Michigan.

29.     Plaintiff Bronson Lakeview Hospital is a not-for-profit hospital serving the people of Van Buren County since 1939. It is incorporated in Michigan and headquartered in Michigan. Bronson Lakeview Hospital is part of the Bronson Healthcare system.

30.     Bronson Methodist Hospital is a regional medical center and children's hospital that serves patients in southwest Michigan. It is incorporated in Michigan and headquartered in Michigan. Bronson Methodist Hospital is part of the Bronson Healthcare system.

31.     Bronson Battle Creek Hospital delivers quality care to over 200,000 people in south-central Michigan. It is incorporated in Michigan and headquartered in Michigan. Bronson Battle Creek Hospital is part of the Bronson Healthcare system.

32.     Plaintiff Trustees of the University of Pennsylvania, on behalf of its operating division, the University of Pennsylvania Health System (UPHS), is a nationally recognized hospital system that has been providing the highest quality patient care, education, and research for more than two centuries. UPHS is incorporated in Pennsylvania and headquartered in Pennsylvania.

33.     Plaintiff Hospital of the University of Pennsylvania is world-renowned for its clinical and research excellence. It is incorporated in Pennsylvania and headquartered in Pennsylvania. Hospital of the University of Pennsylvania is a component of UPHS.

14

34.    Plaintiff The Pennsylvania Hospital of the University of Pennsylvania Health System is the nation's first hospital, founded in 1751 by Benjamin Frankin and Dr. Thomas Bond. It is incorporated in Pennsylvania and headquartered in Pennsylvania. Pennsylvania Hospital is a component of UPHS.

35.    Plaintiff Presbyterian Medical Center of the University of Pennsylvania Health System (d/b/a Penn Presbyterian Medical Center) is a regional leader in providing cutting-edge care in Pennsylvania. It is incorporated in Pennsylvania and headquartered in Pennsylvania. Penn Presbyterian Medical Center is a component of UPHS.

36.    Plaintiff The Lancaster General Hospital is a 525-bed, not-for-profit hospital located in Lancaster City. It is incorporated in Pennsylvania and headquartered in Pennsylvania. Lancaster General is a component of UPHS.

37.    Plaintiff Yale New Haven Health is Connecticut's leading healthcare system, providing comprehensive and integrated care in more than 100 medical specialties. Yale New Haven Health is incorporated in Connecticut and headquartered in Connecticut.

38.    Plaintiff Bridgeport Hospital is a not-for-profit general medical and surgical hospital located in Bridgeport, Connecticut. It is incorporated and headquartered in Connecticut. Bridgeport Hospital is a member of Yale New Haven Health.

39.    Plaintiff Yale New Haven Hospital, Inc. is a nationally-ranked 1,541-bed hospital located in New Haven, Connecticut. It is incorporated and headquartered in Connecticut. Yale New Haven Hospital, Inc. is a member of Yale New Haven Health.

40.    Plaintiff Lawrence + Memorial Hospital is a hospital located in New London, Connecticut. It is incorporated and headquartered in Connecticut. Lawrence + Memorial Hospital is a member of Yale New Haven Health.

41.     Plaintiff Baptist Health South Florida (BHSF) is a not-for-profit health system and is the largest in its region, comprising more than 4,000 physicians serving patients throughout South Florida. In fiscal year 2022, BHSF facilities provided care to more than 21,000 low-income, uninsured patients, with over 47,000 charitable encounters.  BHSF is incorporated and headquartered in Florida.

42.     Plaintiff Baptist Hospital of Miami is BHSF's flagship and award-winning medical center, which is a Magnet-designated hospital for nursing excellence. Baptist Hospital of Miami has 902 licensed beds, is a not-for-profit hospital located in Miami, Florida, and is a Center for Excellence for cancer care, cardiovascular care, and neurosciences. Baptist Hospital is a component of BHSF.

43.     Plaintiff Bethesda Hospital, doing business as Bethesda Hospital East with 401 licensed beds and Bethesda Hospital West with 80 licensed beds, is a not-for-profit hospital offering comprehensive healthcare services located in Boynton Beach, Florida. Bethesda Hospital is a component of BHSF.

44.     Plaintiff Doctors Hospital is an award-winning, Magnet-designated hospital for nursing excellence offering general and specialized services. Doctors Hospital has 281 licensed beds, is a not-for-profit hospital located in Coral Gables, Florida, and is a Center of Excellence for orthopedic care. Doctors Hospital is a component of BHSF.

45.     Plaintiff Homestead Hospital is a modern, full-service 147-bed medical center facility serving patients in the southern-most portion of Miami-Dade County and includes a 23-bed inpatient comprehensive inpatient rehabilitation unit.  Homestead Hospital is not-for-profit serving 43% low-income Medicare and Medicaid patients.  Homestead Hospital is a component of BHSF.

46.     Plaintiff South Miami Hospital is a 432-bed medical center providing a comprehensive array of services, including Level II and Level III neonatal intensive care units. South Miami Hospital is a Magnet-designated hospital for nursing excellence, is a not-for-profit located in South Miami, Florida, and is a component of BHSF.

47.     Plaintiff West Kendall Baptist Hospital is a 203-bed medical center providing care for adult medical and surgical services in Miami, Florida. West Kendall Baptist Hospital is a not-for-profit hospital and is a component of BHSF.

48.     Plaintiff Fishermen's Community Hospital is critical access hospital recently rebuilt after being destroyed by Hurricane Irma in 2017. Fishermen's Community Hospital is a rural not-for-profit hospital located in Marathon, Florida, and is a component of BHSF.

49.     Plaintiff Mariners Hospital is a top-rated critical access hospital providing care to patients in the Florida Keys. Mariners Hospital is a rural not-for-profit hospital located in Tavernier, Florida, and is a component of BHSF.

50.     Plaintiff Mercy Health is a non-profit Catholic organization and is the nineteenth largest healthcare system in the U.S. with hospitals, physician clinics, telehealth services, outpatient facilities, outreach ministries, and other health and human services primarily in Missouri, Oklahoma, Arkansas, and Kansas. Mercy Health is incorporated and headquartered in Missouri.

51.     Plaintiff Mercy Hospital Fort Smith is a Disproportionate Share Hospital and 340B covered entity located in Fort Smith, Arkansas. Mercy Hospital Fort Smith is a component of Mercy Health.

52.     Plaintiff Mercy Hospital Berryville is a Critical Access Hospital and 340B covered entity located in Berryville, Arkansas. Mercy Hospital Berryville is a component of Mercy Health.

53.     Plaintiff Mercy Hospital Booneville is a Critical Access Hospital and 340B covered entity located in Boonville, Arkansas. Mercy Hospital Boonville is a component of Mercy Health.

54.     Plaintiff Mercy Hospital Columbus is a Critical Access Hospital and 340B covered entity located in Columbus, Kansas. Mercy Hospital Columbus is a component of Mercy Health.

55.     Plaintiff Mercy Hospital Joplin is a Disproportionate Share Hospital and 340B covered entity located in Joplin, Missouri. Mercy Hospital Joplin is a component of Mercy Health.

56.     Plaintiff Mercy Hospital Lebanon is a Disproportionate Share Hospital and 340B covered entity located in Lebanon, Missouri. Mercy Hospital Lebanon is a component of Mercy Health.

57.     Plaintiff Mercy Hospital Springfield is a Disproportionate Share Hospital and 340B covered entity located in Springfield, Missouri. Mercy Hospital Springfield is a component of Mercy Health.

58.     Plaintiff Mercy Hospital St. Louis is a Disproportionate Share Hospital and 340B covered entity located in Saint Louis, Missouri. Mercy Hospital St. Louis is a component of Mercy Health.

59.     Plaintiff Mercy Hospital Aurora is a Critical Access Hospital and 340B covered entity located in Aurora, Missouri. Mercy Hospital Aurora is a component of Mercy Health.

60.     Plaintiff Mercy Hospital Carthage is a Critical Access Hospital and 340B covered entity located in Carthage, Missouri. Mercy Hospital Carthage is a component of Mercy Health.

61.     Plaintiff Mercy Hospital Cassville is a Critical Access Hospital and 340B covered entity located in Cassville, Missouri. Mercy Hospital Cassville is a component of Mercy Health.

62.     Plaintiff Mercy Hospital Lincoln is a Critical Access Hospital and 340B covered entity located in Troy, Missouri. Mercy Hospital Lincoln is a component of Mercy Health.

63.     Plaintiff Mercy St. Francis Hospital is a Critical Access Hospital and 340B covered entity located in Mountain View, Missouri. Mercy St. Francis Hospital is a component of Mercy Health.

64.     Plaintiff Mercy Hospital Jefferson is a Disproportionate Share Hospital and 340B covered entity located in Crystal City, Missouri. Mercy Hospital Jefferson is a component of Mercy Health.

65.     Plaintiff Mercy Hospital Perry is a Critical Access Hospital and 340B covered entity located in Perryville, Missouri. Mercy Hospital Perry is a component of Mercy Health.

66.     Plaintiff Mercy Hospital ADA Inc. is a Disproportionate Share Hospital and 340B covered entity located in Ada, Oklahoma. Mercy Hospital Ada is a component of Mercy Health.

67.     Plaintiff Mercy Hospital Ardmore Inc is a Sole Community Hospital and 340B covered entity located in Ardmore, Oklahoma. Mercy Hospital Ardmore is a component of Mercy Health.

68.     Plaintiff Mercy Health Love County is a Critical Access Hospital and 340B covered entity located in Marietta, Oklahoma. Mercy Health Love County is a component of Mercy Health.

69.     Plaintiff Mercy Hospital Healdton Inc is a Critical Access Hospital and 340B covered entity located in Healdton, Oklahoma. Mercy Hospital Healdton is a component of Mercy Health.

70.     Plaintiff Mercy Hospital Logan County is a Critical Access Hospital and 340B covered entity located in Guthrie, Oklahoma. Mercy Hospital Logan County is a component of Mercy Health.

71.     Plaintiff Mercy Hospital Tishomingo Inc is a Critical Access Hospital and 340B covered entity located in Tishomingo, Oklahoma. Mercy Hospital Tishomingo is a component of Mercy Health.

72.     Plaintiff Mercy Hospital Watonga Inc is a Critical Access Hospital and 340B covered entity located in Watonga, Oklahoma. Mercy Hospital Watonga is a component of Mercy Health.

73.     Plaintiff Mercy Hospital Kingfisher is a Critical Access Hospital and 340B covered entity located in Kingfisher, Oklahoma. Mercy Hospital Kingfisher is a component of Mercy Health.

74.     Plaintiff Mercy Hospital Oklahoma City is a Disproportionate Share Hospital and 340B covered entity located in Oklahoma City, Oklahoma. Mercy Hospital Oklahoma City is a component of Mercy Health.

75.     Each Plaintiff to this action is a petitioner in the ADR proceeding pending before HRSA.

76.     Defendant Health Resources and Services Administration (HRSA) is an agency of the United States and a division of the United States Department of Health and Human Services (HHS). HRSA is the principal agency responsible for administration of the 340B program. Its headquarters and principal place of business are in Maryland.

77.     Defendant Thomas J. Engels is the Administrator of the Health Resources and Services Administration. The Administrator maintains an office at 5600 Fishers Lane, Rockville, Maryland 20857. He is sued in his official capacity only.

78.     Defendant HHS is a cabinet-level executive department charged with enhancing the health and wellbeing of all Americans. HHS is headquartered and maintains its principal place of business in Washington, D.C.

79.     Defendant Robert F. Kennedy Jr. is the Secretary of Health and Human Services. The Secretary maintains an office at 200 Independence Avenue SW, Washington, D.C. 20201. He is sued in his official capacity only.

## JURISDICTION

80.     Plaintiffs bring this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and the Mandamus Act, 28 U.S.C. § 1361.

81.     HRSA's delay in adjudicating the petition is "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704; 5 U.S.C. § 706(1); *see also id.* §§ 701(b)(2), 551(13) (defining "agency action" to include "failure to act").

82.     This case arises under the laws of the United States. The court's jurisdiction is thus invoked under 28 U.S.C. § 1331.

83.     Venue is proper in this district under 28 U.S.C. § 1391(e) both because at least one defendant resides in this district and because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### A.      Legal Background

#### 1.      The 340B Program

84.     In 1992, Congress enacted Section 340B of the Public Health Service Act, codified at 42 U.S.C. § 256b. As amended, the law requires manufacturers to "offer discounted drugs to covered entities" to be eligible for participation in (*i.e.*, reimbursement from) Medicaid and Medicare Part B. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 115 (2011). Congress created the

340B program to provide "protection from drug price increases to specified Federally-funded clinics and . . . hospitals that provide direct clinical care to large numbers of uninsured Americans." H.R. Rep. No. 102-384, pt. 2, at 12.

85.     Section 340B defines covered entities to include (among others) black lung clinics, certain children's hospitals and standalone cancer hospitals, critical access hospitals, rural referral centers, federally funded health centers, and certain government-owned and non-profit hospitals that serve a disproportionate share of low-income patients. 42 U.S.C. § 256b(a)(4). Covered entities are "dominantly, local facilities that provide medical care for the poor." *Astra USA*, 563 U.S. at 115; *accord Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 727 (2022) ("Section 340B hospitals . . . generally serve low-income or rural communities."). And as described, Congress intended the 340B program to allow covered entities to "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12.

86.     "The federal government is the largest purchaser of prescription drugs in the United States." *Prescription Drugs*, Cong. Budget Off. (accessed Sep. 26, 2025), perma.cc/WZY2-SYQM. The United States pays for drugs in part through federal programs such as Medicaid and Medicare Part B. *Id.*

87.     While the United States, the states, and U.S. territories are responsible for a significant amount of overall drug spending through Medicare and Medicaid, manufacturer participation in Medicare and Medicaid is voluntary. Manufacturers may choose whether or not their drugs are eligible to be reimbursed by these programs.

88.    For Medicare or Medicaid to make payment for covered outpatient drugs, "a manufacturer must enter a standardized agreement" with HHS in which the manufacturer "undertakes to provide rebates to States on their Medicaid drug purchases." *Astra USA*, 563 U.S. at 114.

89.    Section 340B states that manufacturers wishing to participate in the Medicaid and Medicare Part B programs also "shall enter into an agreement" with the Secretary of Health and Human Services "under which the amount required to be paid . . . to the manufacturer for covered outpatient drugs . . . purchased by a covered entity . . . does not exceed" a specified ceiling price. 42 U.S.C. § 256b(a)(1). These Pharmaceutical Pricing Agreements (PPAs) must "require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." *Id.*

90.    HRSA and HHS have consistently explained that under these provisions of the 340B statute, "[m]anufacturers may not single out covered entities from their other customers for restrictive conditions that would undermine the statutory objective." Final Notice Re: Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25,110, 25,111-112 (May 13, 1994). In particular, manufacturers may not place "limitations on sales transactions" that "could . . . discourag[e] entities from participating in the program." *Id.* at 25,111.

91.    In addition, Section 340B contains specific safeguards to prevent waste, fraud, and abuse. The statute prohibits "duplicate discounts or rebates," which precludes any prescription from benefitting both from a discount under 340B and from a Medicaid rebate. 42 U.S.C. § 256b(a)(5)(A). It further prohibits the "res[ale] or . . . transfer" of drugs to any "person who is not a patient of the [covered] entity"—a practice known as "diversion." *Id.* § 256b(a)(5)(B). To ensure compliance and transparency, Section 340B allows the Secretary and the manufacturer

to audit a covered entity's records. *Id.* § 256b(a)(5)(C). If a covered entity violates these requirements, it can be liable to a manufacturer for an amount equal to the discount. *Id.* § 256b(a)(5)(D).

### 2.    HRSA's ADR Program

92.    Amendments made to Section 340 in 2010 as part of the Patient Protection and Affordable Care Act directed HHS to establish an administrative alternative dispute resolution process, empowering the agency to resolve disputes between covered entities and manufacturers. 42 U.S.C. § 256b(d)(3); *see also Astra USA*, 563 U.S. at 116. Congress required that the HHS Secretary promulgate implementing regulations "[n]ot later than 180 days after March 23, 2010." 42 U.S.C. § 256b(d)(3)(A).

93.    HHS and HRSA issued an advanced notice of proposed rulemaking in 2010 requesting comments on the development of an ADR process. 75 Fed. Reg. 57,233 (Sept. 20, 2010). The agency received several comments but took no further action for several years.

94.    In 2016, the agencies issued a notice of proposed rulemaking (NPRM) concerning the development of an ADR process. 81 Fed. Reg. 53,381 (Aug. 12, 2016). That NPRM was "removed from the HHS Regulatory Agenda," which HHS has described as "pausing action on the proposed rule." 85 Fed. Reg. 80,633 (Dec. 14, 2020) ("2020 Rule"). In 2020, HRSA explained that the action "did not formally withdraw the NPRM, but rather left it open as a viable option"— and adopted a final rule to govern ADR proceedings based on the NPRM and the comments it had received. *Id.*; *see Sanofi Aventis U.S. LLC v. U.S. DHHS*, 58 F. 4th 696, 706-707 (3d Cir. 2023) (holding the 2020 ADR rule lawful).

95.    The 2020 Rule was in effect when Plaintiffs filed their ADR petition on November 21, 2023. Under the 2020 Rule, HRSA determined that "to the extent applicable," the ADR process should be governed "by the Federal Rules of Civil Procedure and Federal Rules of Evidence." 85

Fed. Reg.at 80,633; *see* 42 C.F.R. § 10.23(b)-(c) (2020). The petition therefore complied with the pleading requirements of Federal Rule of Civil Procedure 8.

96.     HHS and HRSA issued another NPRM to propose revisions to the 340B ADR process on November 30, 2022. 87 Fed. Reg. 73,516 (Nov. 30, 2022). The agencies finalized those revisions and formally amended the ADR rules on April 19, 2024—while Plaintiffs' ADR petition was pending, and after HRSA had acknowledged that it was complete and Teva had responded. 89 Fed. Reg. at 28,643.

97.     One notable change in the 2024 Rule was the abandonment of any reliance on the Federal Rules of Civil Procedure. *Id.* In departing from the Federal Rules, HHS and HRSA sought to make the process "more accessible" for stakeholders and "use fewer stakeholder and government resources to resolve disputes." *Id.* at 28,645. Its goal was to provide "an expeditious and less formal process for parties to resolve disputes than the 2020 final rule." *Id.* at 28,643.

98.     Under the 2024 Rule, the ADR process is as follows:

> (a.) A petitioner (or group of petitioners) files a petition and supporting documentation by emailing HRSA and then uploading documents to a 340B ADR workspace. 42 C.F.R. § 10.21(d)(1).
>
> (b.) A HRSA employee will review the submissions and make a determination as to whether the requirements for filing a claim are satisfied. 42 C.F.R. § 10.21(d)(2). HRSA will then notify the petitioner that the claim is complete. *Id.* § 10.21(d)(4).
>
> (c.) If HRSA determines that the claim is complete, it will provide notice to the opposing party of the claim's status and of the deadline for responding to the claim (30 days). 42 C.F.R. § 10.21(d)(5), (e)(1).

(d.) During the ADR process, covered entities are permitted to submit requests for information and documentation to HRSA, which will transmit those requests to the manufacturers if the requests are reasonable and relevant. 42 C.F.R. § 10.22(b). The manufacturer must respond. *Id.* § 10.22(c).

(e.) After a claim is deemed complete, an agency official "shall select" a 3-member ADR Panel from individuals on the 340B ADR Roster. 42 C.F.R. § 10.20. The Roster consists of staff within HRSA's Office of Pharmacy Affairs (OPA). *Id.*

(f.) The ADR Panel "will" then adjudicate the claims. 42 C.F.R. § 10.20(d). It will review "all documents gathered during the 340B ADR process" and "prepare a decision letter based on its review." 42 C.F.R. § 10.23(a), (b). That decision serves as the "final agency decision" unless reconsideration is requested. *Id.* § 10.23(c).

(g.) The Director of OPA "will determine any necessary corrective action or consider whether to take enforcement action, and the form of any such action, based on the final agency decision." 42 C.F.R. § 10.23(d).

(h.) Parties may seek reconsideration within 30 business days of issuance of the Panel's letter, or the HRSA Administrator may initiate the reconsideration process on his own. 42 C.F.R. § 10.24(a), (b). If a reconsideration request is filed, the Panel's decision is held in abeyance until the reconsideration request is disposed of. *Id.*

99.     HRSA provides the following graphic as an overview of the "ADR process flow":



Ex. 1 (HRSA, 340B Administrative Dispute Resolution (June 2025)).

100.     Numerous commenters on the 2024 Rule urged HHS to "impose a timeframe for ADR Panel decisions to ensure that 340B ADR claims are resolved in a timely manner." 89 Fed. Reg. at 28,653. In response, HHS "clarif[ied] that the expectation is that the 340B ADR Panel will make a decision on a claim within one year of receiving the claim for review." *Id.* While HHS explained that extenuating circumstances could cause the ADR Panel to take more than one year to adjudicate a claim, it "d[id] not believe that many claims that are submitted under [the 2024] rule will take longer than a year to resolve." *Id.* Regardless, HHS explained that "the 340B ADR Panel will inform the parties, no later than 1 year from the date a claim is deemed complete, if the forthcoming decision will exceed that one year timeframe and provide an explanation as to why the decision on the claim will exceed one year." *Id.*

101.     These expectations were codified into HRSA's regulations. *See* 42 C.F.R. § 10.23(b). Under the current rules, "[t]he 340B ADR Panel's decision letter *will be completed* within one year of receiving a complete claim for review, except to the extent that there are situations beyond the control of the 340B ADR Panel that may affect the ability to issue a decision on

a claim within one year." *Id.* (emphasis added). "If the issuance of a 340B ADR Panel decision will exceed one year, the 340B ADR Panel must provide notice to the parties involved." *Id.*

102.    According to HHS, the 2024 Rule "modifie[d] procedural requirements for the 340B ADR process" but did "not affect the substance of claims at issue for the ADR panel." 89 Fed. Reg. at 28,646. It thus concluded that it could permissibly "provide for the automatic transfer of any pending claims to the new process." *Id.* at 28,645. Claims that were pending and which were subsequently transferred to the new ADR process would "be first in the queue to be reviewed." *Id.* at 28,646.

## B.    Proceedings before HRSA

103.    Plaintiffs filed their petition challenging Teva's contract pharmacy policy on November 21, 2023. The petition was designated number 231120-20.

104.    On December 20, 2023, HRSA informed Plaintiffs that it "ha[d] done an initial review of [the] petition and determined [the] petition is complete." Ex. 2. It stated that "[a] panel has not yet been assigned to th[e] petition" but that "[o]nce a panel is assigned all parties will be notified." *Id.* HRSA did "not have an estimate of when this petition will be assigned to a panel at this time." *Id.*

105.    Teva filed an initial response to the petition on January 28, 2024, asking that the claims be dismissed or stayed.

106.    The 2024 Rule was finalized on April 19, 2024, while the petition was pending before HRSA.

107.    On June 27, 2024, HRSA reached out to counsel for Plaintiffs to coordinate the transfer of the petition to the new ADR process. Ex. 3. HRSA instructed that to the extent Plaintiffs "would like to submit additional information, or withdraw the claim," they should do so "by July 29, 2024." *Id.* (emphasis omitted).

108.    Plaintiffs submitted additional declarations and documents in support of their claim attached to a combined motion for summary judgment and response to Teva's motion to stay or dismiss on July 19, 2024.

109.    Teva filed a response to Plaintiffs' filing on October 4, 2024.

110.    Plaintiffs filed a reply in support of their request on December 17, 2024.

111.    On June 3, 2025, counsel for Plaintiffs emailed HRSA to inquire about the agency's progress in adjudicating the petition. HRSA responded the same day, stating that "[a] panel has not yet been assigned to this petition" and that "[t]here is no estimate on when a panel will be assigned at this time." Ex. 4. The agency stated that the parties "will receive notice once a panel is assigned."

112.    Plaintiffs have not received any notification from HRSA that an ADR Panel has been selected. They have not received a notification that the adjudication of their claim, which has been pending for nearly two years, will take more than one year. They have not received any requests for additional information from HRSA since their petition was deemed complete. And they have not received a decision letter adjudicating their claim.

**C.    The Court should compel HRSA to promptly adjudicate Plaintiffs' claims.**

113.    HRSA's failure to even *initiate* proceedings on Plaintiffs' ADR claims warrants the issuance of a writ of mandamus and/or relief under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed." The legal analysis for both forms of relief is the same: analysis under the *TRAC* factors. *See, e.g.*, *Bagherian v. Pompeo*, 442 F. Supp. 3d 87, 96 (D.D.C. 2020) ("The standard by which a court reviews agency inaction is the same under both § 706(1) of the APA and the Mandamus Act.") (quotation marks omitted; alteration incorporated).

114.    In *TRAC*, the D.C. Circuit set out factors governing agency delay claims:

1.    [T]he time agencies take to make decisions must be governed by a rule of reason;

2.  where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

3.  delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

4.  the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

5.  the court should also take into account the nature and extent of the interests prejudiced by delay; and

6.  the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984) (*TRAC*) (citations and quotation marks omitted).

115.    Those factors are satisfied here. First, the ADR regulations provide the yardstick by which reasonability can be readily determined. HHS has codified its expectation that claims will be adjudicated within one year of receipt. 42 C.F.R. § 10.23(b). The regulatory language is unambiguous: "The 340B ADR Panel's decision letter *will* be completed within one year of receiving a complete claim for review, except to the extent that there are situations beyond the control of the 340B ADR Panel that may affect the ability to issue a decision on a claim within one year." *Id.* (emphasis added). And whenever "the issuance of a 340B ADR Panel decision will exceed one year, the 340B ADR Panel *must* provide notice to the parties involved." *Id.* (emphasis added).

116.    Moreover, this regulatory expectation accords with Congress's instruction that claims "*shall* be resolved fairly, efficiently, and expeditiously." 42 U.S.C. § 256b(d)(3)(B)(ii) (emphasis added). The words "will," "must," and "shall" are unmistakably mandatory. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320-21 (D.C. Cir. 1988). There is no question that these regulatory provisions provide a timetable for the agency's processing of ADR petitions, which is a mandatory regulatory and statutory obligation.

117.    To determine whether a delay was unreasonable, the Court must "ascertain the length of time that has elapsed since the agency came under a duty to act, and . . . evaluate any prospect of early completion." *Cutler v. Hayes*, 818 F.2d 879, 897 (D.C. Cir. 1987); *accord, e.g.*, *Afghan and Iraqi Allies Under Serious Threat v. Pompeo*, 2019 WL 4575565, at *8 (D.D.C. 2019) (applying *Cutler*). Here, HRSA became obligated to act on Plaintiffs' petition no later than December 20, 2023, when it informed Plaintiffs that the petition was complete and that it would be assigned to an ADR panel. It has been more than 21 months since then, and HRSA has not even started adjudicating the petition by assigning a panel. Review has thus already significantly exceeded the agency's one-year expectation. And because HRSA has not "provide[d] the plaintiff[s] with a definite time frame for review of [their] petition," the Court cannot "evaluate any prospect of completion." *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 37 (D.D.C. 2000). In fact, "the record does not reflect that the defendants have any notion as to when they will complete the review process." *Id.* "This ambiguity defeats any assertion that the process proceeds with reasonable dispatch." *Id.*

118.    From HRSA's public website, it appears that the agency has only adjudicated one petition in the year since the 2024 Rule went into effect. *340B ADR Decision Summaries*, HRSA

(May 15, 2025), Ex. 5. Updated on May 15, 2025, HRSA's "ADR Decision Summaries" page includes only one entry, for a challenge by other covered entities to a different manufacturer's contract pharmacy policy.

119.    On the third and fifth *TRAC* factors, Plaintiffs are seriously prejudiced by HRSA's ongoing delay, which is impacting their ability to provide expanded services to their patient populations. They explained as much in their petition. And as declarations filed by various petitioners demonstrated, the challenged policies are costing petitioners collectively tens of millions of dollars each year in lost 340B revenue each year. Every day that HRSA's delay allows Teva's unlawful policy to remain in place causes Plaintiffs to suffer further losses.

120.    The harms from the delay also extend beyond the financial, threatening public health by reducing patient access to necessary care and community benefit programs. Because Plaintiffs participate as safety-net hospitals, many experience millions of dollars in Medicaid shortfall each year. Many entities therefore rely on 340B discounts to remain solvent. Protracted delays in receiving these discounts threaten the viability of these covered entities. *Am. Hosp. Assoc. v. Burwell*, 812 F.3d 183, 193 (D.C. Cir. 2016).

121.    That is, the longer manufacturers are permitted to improperly deny access to 340B discounts, the greater the chance that covered entities must cease beneficial community programs, close child sites providing necessary care, or decrease the level of care they are able to provide to remain in operation

122.    Moreover, when safety-net hospitals shrink or close, patients often cannot turn elsewhere for replacement care—some Plaintiffs operate the only source of various critical and intensive care services available in their service regions. *Id.* The loss of 340B savings thus threatens to "reduce[] the level of services and the number of individuals that these hospitals and clinics are

able to provide with the same level of [federal] resources"—the precise concern Congress tried to address with the 340B program. H.R. Rep. 102-384, pt. 2, at 11. The D.C. Circuit has recognized that similar harms caused by delays in access to funds "counsel in favor of mandamus." *Am. Hosp. Assoc.*, 812 F.3d at 193 (citing a declaration explaining that "having money tied up . . . makes it much more difficult to purchase replacement ICU beds . . . and replace a twenty-year old catheter-ization lab which will 'soon need to be shut down'"). "[C]ommon sense suggests that lengthy payment delays will affect hospitals' willingness and ability to provide care." *Id.*

123.    On information and belief, HRSA will not be unduly prejudiced by an order compelling it to adjudicate the petition. The agency already has a regulatory obligation to do so and has resolved at least one other petition since the 2024 Rule went into effect. More, it is unlikely that compelling HRSA to adjudicate Plaintiff's petition will prejudice other agency priorities or result in unfair line-cutting. HHS provided that petitions pending at the time the 2024 Rule became final would be given top priority in the queue in the new system. 89 Fed. Reg. at 28,646. But at the same time, HHS stated that "[o]utside of" the issue covered by Plaintiffs' petition, "OPA has only received three covered entity overcharge complaints since making 340B ceiling prices avail-able to covered entities through 340B OPAIS" in 2019. *Id.* at 28,644. It is difficult to imagine that, given this extraordinarily low volume of petitions over the last six years, the delays here are caused by reasonable adjudication of other petitions in the queue. This is especially so because HRSA's regulations require it to notify petitioners when delays are caused by such extenuating circum-stances. 42 C.F.R. 10.23(b). HRSA has not done so here.

## CLAIMS FOR RELIEF

### COUNT I
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(1)

124.    Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

125.    The APA empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

126.    HRSA has a nondiscretionary duty to adjudicate Plaintiffs' petition. The agency's regulations provide that such adjudication will ordinarily take no more than one year, and require that the agency notify petitioners with an explanation when extenuating circumstances will cause delays. 42 C.F.R. § 10.23(b).

127.    It has been more than 22 months since Plaintiffs submitted their petition, and more than 21 months since HRSA acknowledged that the petition was complete. To date, HRSA has not even begun the process of adjudicating the petition by assigning an ADR panel.

128.    HRSA's delay is egregious and unreasonable. The *TRAC* factors warrant relief. 750 F.2d 70.

129.    The Court should therefore "compel" HRSA to act on Plaintiffs' petition pursuant to 5 U.S.C. 706(1) by promptly appointing an ADR panel, which should then expediently issue a determination.

### COUNT II
### MANDAMUS ACT, 28 U.S.C. § 1361

130.    Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

131.    The Mandamus Act provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer . . . of the United States or any

34

agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361; *see also id.* § 1651 (All Writs Act, providing that courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law").

132.    HRSA has a nondiscretionary duty to adjudicate Plaintiffs' petition. The agency's regulations provide that such adjudication will ordinarily take no more than one year, and require that the agency notify petitioners with an explanation when extenuating circumstances will cause delays. 42 C.F.R. § 10.23(b).

133.    HRSA's delay is egregious and unreasonable. The *TRAC* factors warrant relief. 750 F.2d 70.

134.    The Court should therefore issue a writ of mandamus compelling HRSA to act on Plaintiffs' petition by promptly appointing an ADR panel, which should then expediently issue a determination.

## PRAYER FOR RELIEF

WHEREFORE, petitioners respectfully request that the Court enter judgment in their favor and that the Court:

(a.) Compel HRSA to appoint an ADR panel and promptly adjudicate Plaintiffs' petition pursuant to 5 U.S.C. § 706(1);

(b.) Issue a writ of mandamus compelling HRSA to comply with its obligation to adjudicate Plaintiffs' petition;

(c.) Award Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: September 29, 2025

Respectfully submitted,

/s/ *Paul W. Hughes*

Emily J. Cook*
MCDERMOTT WILL & SCHULTE LLP
2049 Century Park E #3200
Los Angeles, CA 90067
(310) 277-4110
ecook@mwe.com

*Pro hac vice motion forthcoming*

Paul W. Hughes (Bar No. 997235)
Andrew A. Lyons-Berg (Bar No. 230182)
Charles Seidell (Bar No. 1670893)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Counsel for all Plaintiffs*